IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **TERRY L. HARDIN, JR.,** ) | |
| ) | |
| **Plantiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO. 5:07-CV-0866-KOB** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION**

**I. Introduction**

The Claimant, Terry Hardin, Jr., filed applications for Disability Insurance Benefits ("SSDI") and Supplemental Security Income payments ("SSI") on February 26, 2004. (R. 200-01). He claimed a disability onset date of December 7, 2001 (R. 64) caused by severe impairments of residual effects of a remote Cerebrovascular Accident ("CVA") – *i.e.*, a stroke – occurring in 1994, and an Adjustment Disorder with Anxiety.[1] (R. 213). On June 11, 2004, the Social Security Administration denied his application, and Claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. 50). On February 15, 2006, the ALJ held a hearing in Gadsden, Alabama, at which Claimant appeared and testified. (R. 212).

---

[1]Claimant had also filed a prior application for disability benefits on September 4, 2001, and, on November 26, 2001, the Commissioner determined that Claimant was not disabled. The ALJ in the instant case did not re-open the prior determination because Claimant did not seek to re-open it, and the record included no evidence that Claimant had met the conditions for re-opening. *See* 20 C.F.R. §§ 404.988 and 416.1488. (R.79, R. 60-63).

1

Vocational Expert ("VE") James Hare also testified. (R. 29). In a decision dated September 5, 2006, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act and was not entitled to a period of disability, SSDI, or SSI payments. (R. 40-41). That denial became the final decision of the Commissioner of the Social Security Administration on March 9, 2007 when the Appeals Council refused Claimant's request for review. (R. 6-9, 26). Claimant has exhausted the administrative remedies available before the Commissioner, and this case is now ripe for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). Based on the court's review of the record and the parties' briefs, the court concludes that the decision of the Commissioner will be REVERSED and REMANDED for further proceedings.

## II. Legal Standard

Under 42 U.S.C. § 423 (d)(1)(A), a person is entitled to disability benefits when the person cannot

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination, the Commissioner employs five-step, sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three or five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

### III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but must also view the record in its entirety and take account of evidence that detracts from evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Facts

Claimant was twenty-six years old at the time of the administrative hearing and has an eighth-grade education. (R. 218). His past work experience includes employment as a knitter, a packager, and a molding machine operator. (R. 40). Claimant's last and longest-held job was that of a knitter at Charleston Hosiery sock mill, where he carried spools of yarn and threaded

3

knitting machines. (R. 83, 102). Claimant testified that he worked for Charleston Hosiery for about eight months, until the beginning of 2001, when he was fired for "poor production . . . [and] dissatisfactory work." (R. 220).  Claimant "begged" for his job back and was re-hired a month later. (R. 221)  He had friends who helped him perform his work; however, Claimant was fired again within a month for tardiness. (R. 221-22).

According to Claimant, he became unable to work on December 7, 2001, due to severe impairments of residual effects of a remote Cerebrovascular Accident ("CVA") occurring in 1994, and an Adjustment Disorder with Anxiety. (R. 37).  Claimant was insured for Disability Insurance Benefits through June 30, 2002. (R. 69).

In 1994, Claimant developed progressive numbness on the left side of his face and in his left arm and leg. (R. 150).  He was diagnosed with a CVA with left hemiparesis. (*Id.*).  On February 26, 2004, Claimant filed the instant application for benefits. (R. 200-01).  On April 21, 2004, Dr. V.S. Reddy, an internist, saw Claimant for a claims-related consultative physical examination. (R.152).  Her diagnostic impression was that Claimant suffered a CVA at age fifteen with residual weakness in the left leg with hyperflexia, but his grip was equal bilaterally; finger dexterity was within normal limits; flexion and extension of the lumbar spine was within normal limits; and the range of movements in all joints was within normal limits. (*Id.*).

On May 27, 2004, Claimant saw psychologist Mary Arnold, Psy. D., for a claims-related consultative psychological evaluation. (R.154-55).  Dr. Arnold estimated Claimant's full-scale IQ to fall in the low average range and his current Global Assessment of Functioning ("GAF") to be 60.[2] (*Id*). She opined that he had the skills to manage funds. (*Id.*).

---

[2]According to the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), a GAF of 51 to 60 denotes "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning

On two occasions in 2005 – February 4 and July 14 – Claimant saw Dr. Janki Gehi, an internist, at Scottsboro Primary Health Clinic for complaints unrelated to his disability claim, including fever, congested cough, sneezing, and sinus problems. (R. 187-88).  On the second visit to Dr. Gehi, Claimant requested medication for depression, and Dr. Gehi prescribed Zoloft. (*Id.*).

On September 20, 2005, Claimant saw Jenna Culpepper, a Certified Registered Nurse Practitioner ("CRNP"), at the Northeast Alabama Health Services Primary Health Center, complaining of left-sided numbness, congestion, and a productive cough. (R. 186).  He also complained of anxiety, and his mother requested Xanax on his behalf. (*Id.*).  CRNP Culpepper reported diagnostic impressions of serous otitis, bronchitis, and anxiety. (*Id.*).  Although she could not prescribe Xanax because it is a controlled substance, Culpepper prescribed BuSpar to be taken twice daily as needed for nerves. (*Id.*).  She also advised Claimant to return in two weeks for a follow-up evaluation, but no evidence exists in the record of any additional visit. (*Id.*).

Claimant visited Dr. James Halsey, a neurologist, three times in October and November, 2005, listing as chief complaints his stroke and left hemiparesis onset ten years previously. (R. 183).  Dr. Halsey ordered an MRI brain scan and neuroultrasound, and Claimant returned at the end of October to receive the results, which revealed a normal brain aside from a right paramedian ponture infarct. (R. 177).  Finally, Claimant returned to Dr. Halsey on November 30, 2005, at which time Dr. Halsey noted no clinical change in Claimant, who exhibited "normal perception and strength" and concluded  that Claimant was "likely disabled due to mental

---

(*e.g.*, few friends, conflicts with peers or co-workers)." *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Am. Psychiatric Ass'n 2000)*.*

retardation and left hemiparesis." (R. 190). Dr. Halsey opined that Claimant's intellect was probably sub-normal, but Halsey's physical findings on examination were unremarkable aside from slowing "fist circling," some mild left clumsiness/weakness, and a gait that was "a little slow with hyperactive left side reflexes." (*Id.*). Dr. Halsey found that Claimant could use his left arm and hand, but observed that he showed a tendency to neglect or ignore it. (*Id.*). Dr. Halsey characterized Claimant as relatively mentally insightful and exhibiting relatively normal perception and strength. (R. 184).

On April 7, 2006, Claimant saw Samuel Fleming, III, Ph.D., a clinical neuropsychologist, for a claims-related consultative psychological evaluation arranged by Claimant's attorney. (R. 193). Dr. Fleming found that Claimant generated a full-scale IQ of 82 and had an Axis V: GAF of 45.[3] (R. 196-97).

In an undated, one page medical record, Usman Barula, M.D., of the University of Alabama Health Services Foundation filled out a Patient Charity Care Application Physician Disability Confirmation form stating that Claimant's major injury that kept him from working was a CVA in 1996,[4] and that he would be unable to work for an indefinite period of time. (R. 192).

In his evaluation of the claim at issue, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset of disability. (R. 31). Considering Claimant's

---

[3] According to the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), a GAF of 41 to 50 denotes "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g. no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Am. Psychiatric Ass'n 2000).

[4] Although Dr. Barula notes that Claimant's CVA occurred in 1996, all other medical records indicate that it occurred in 1994.

medical record and testimony, the ALJ concluded that Claimant has suffered from "severe medically determinable impairments." (R. 37). However, the ALJ did not find that any of the Claimant's impairments, singularly or in combination, met or equaled the impairments listed at 20 C.F.R. pt. 404, subpart P, app.1. (*Id.*).

After considering all relevant medical and non-medical evidence, the ALJ determined Claimant's residual functional capacity ("RFC"). Relying upon the opinion of Dr. Gordon Mitchell, a DDS physician who examined the case record, the ALJ found the Claimant's physical RFC consists of the ability to lift and carry up to fifty pounds occasionally and twenty-five pounds frequently; to stand and walk for up to six hours in an eight-hour workday with regular breaks; to sit without limitation; to frequently climb, stoop, kneel, and reach; to occasionally crouch and crawl; and to use his non-dominant hand frequently for tasks requiring fine and gross manipulation and his dominant hand without limitation. (R. 37). The ALJ apparently adopted the complete report of Dr. Mitchell in his physical RFC finding, although he failed to recognize the limitation in Dr. Mitchell's report that Claimant could never climb a ladder, rope, or scaffolds. (R. 121). Further, Dr. Mitchell's report includes no findings about Claimant's ability to perform gross and fine manipulation with either his dominant or his non-dominant hand. (R. 118-24).

Relying upon the review of State Agency consultant and psychologist Dale Leonard, Ph.D., the ALJ found that Claimant's mental RFC consists of the ability to understand, carry out, and remember simple instructions without limitation; moderate limitations in his ability to respond appropriately to supervision, coworkers, and usual work situations; and mild to moderate limitations in his ability to deal with changes in a routine work setting. (R. 38). Dr. Leonard found that Claimant had the ability to perform both simple and detailed tasks, although he had

7

limited concentration, and that Claimant responded best to gradual changes in the workplace and supportive, non-confrontational supervision. (R. 159).

Based upon the physical and mental RFC findings, the ALJ found that Claimant has the capacity to perform his past relevant work as a knitter, packager, and molding machine operator and, thus, was not under any "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision.[5] (R. 40). After finding that Claimant could perform his past relevant work, the ALJ did not proceed to determine whether Claimant could perform other work in the national economy.

## V. Issues Presented

In this appeal, Claimant argues that the ALJ erred by failing to accord sufficient weight to certain treating and examining physicians in the record. Claimant also argues that the ALJ's physical RFC finding is not supported by substantial evidence.

## VI. Discussion

**A. Whether the ALJ gave sufficient weight to treating and examining physicians in the record.**

Claimant argues that the ALJ failed to give sufficient weight to treating and examining physicians in the record. The ALJ must accord the testimony of a treating physician substantial or considerable weight unless the ALJ provides "good cause" for doing otherwise. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The Federal Regulations define a "treating physician" as one with whom the claimant has an "ongoing treatment relationship" or someone the claimant "sees or

---

[5] VE Hare testified that, according to the *Dictionary of Occupational Titles* ("DOT"), knitter is semiskilled work performed at the medium level of physical exertion, and packager and molding machine operator are both unskilled work performed at the medium level of physical exertion. (R. 228).

ha[s] seen with frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical conditions." 20 C.F.R. § 404.1502. The Federal Regulations provide that the ALJ will not consider a physician to be Claimant's "treating source" if his relationship with the source is based solely upon a need to obtain a report in support of Claimant's claim for disability, rather than a medical need for treatment or evaluation. *Id.* In such a case, the ALJ will consider the acceptable medical source to be a non-treating source. *Id.*

Applying this standard, the court finds that Claimant has no physicians who qualify as treating sources. Claimant characterizes one doctor – Dr. James Halsey – as a treating physician and implies that three examining sources – Drs. Usman Barula and Janki Gehi, and Nurse Jenna Culpepper – were accorded insufficient weight, although he does not suggest whether Claimant believes them to be treating sources. Yet, Claimant had seen none of the medical providers in the record before he filed an application for benefits. After filing the application for benefits, Claimant saw Dr. Halsey on three occasions over a two month period; CRNP Culpepper on one occasion; and Dr. Gehi on only two occasions for symptoms unrelated to his disability claim. Claimant's few visits to Dr. Halsey over a short period of time are insufficient to establish the "ongoing treatment relationship" standard set out by the regulations. Because a single visit to a physician is insufficient to establish a treating source relationship, neither Culpepper nor Dr. Barula may be considered a treating source. *See* 20 C.F.R. § 404.1502. Further, that Claimant visited each of these physicians only *after* he filed for disability benefits suggests that his need was solely to obtain a report in support of his claim, which may not constitute a treating source. Consequently, although the ALJ should give priority to the opinions of treating physicians unless good cause is shown, none of these physicians qualifies as a treating physician.

As none of Claimant's doctors are "treating physicians," the ALJ has discretion to determine the weight afforded to all medical opinions, although he must clearly articulate his reasons for doing so and base his decision on substantial medical evidence. *See Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (holding the ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion"). Consequently, the ALJ is not required to find that a claimant is disabled simply because a medical source ultimately finds that the claimant is "disabled" or "unable to work." *See* 20 C.F.R. § 404.1527(e). As Dr. Halsey's ultimate finding that Claimant was likely disabled was inconsistent with his examination record, his determination was not binding on the ALJ. He conducted no testing of Claimant's actual level of intellectual functioning and characterized the CVA complications as "mild;" inexplicably, he nonetheless concluded that Claimant was "likely disabled" due to mental retardation and left hemiparesis. (R. 39, R. 177-84, R. 190).

In an unsigned and undated opinion, Dr. Barula opined that Claimant had suffered a CVA and would be unable to work for an "indefinite" time frame. (R. 192). However, evidence in the record of Claimant's post-CVA work significantly undermines the importance of Dr. Barula's decision, as Claimant could have seen Dr. Barula at *any time* following the CVA, and Claimant had worked post-CVA.

The ALJ also rejected the medical testimony of Dr. Fleming, a clinical neuropsychologist and consulting physician who examined Claimant at the request of his attorney, reasoning that Claimant's work history (all post-CVA) contradicts Dr. Fleming's finding that Claimant "is clearly not capable emotionally or cognitively to cope with the demands of the normal work environment." (R. 38-39). In addition, Claimant testified that he lost his last job because of "poor production, [he was] too slow . . . [and performed] dissatisfactory work." (R. 220). The

ALJ noted that Claimant was able to reacquire his job and keep it for two months before again being fired, this time for extreme tardiness. (R. 220). The ALJ found that Claimant "worked successfully in the textile mills and was fired from his last job not because he was unable to carry out the physical or mental demands of the job but because he was repeatedly late in reporting for work." (R.39). Claimant stated that he lost his job because he "had been late too many times," even admitting that he "messed it up." (R. 222). After his termination, Claimant made no attempt to find other permanent employment, but instead "just gave up." (R. 223). Contrary to Dr. Fleming's opinion that Claimant could not perform effectively in a normal work environment, evidence reflects that Claimant was physically and mentally able to hold a job, but was fired from his last job for tardiness, not poor performance. (R. 234).

In sum, substantial evidence supports the ALJ's conclusion that the opinions of Drs. Barula, Halsey, and Fleming are inconsistent with the totality of the record. The ALJ did not improperly weigh the opinions of any treating physicians in the record, as none existed, and he properly stated his reasons for discrediting examining physicians in the record. This court finds that the ALJ expressed with particularity the weight attributed to the opinions of Drs. Halsey, Barula, and Fleming, and the reasons for his attributions. *See Sharfsay v. Bowen*, 82 F.2d 278, 279 (11th Cir. 1987). Accordingly, substantial evidence supports his rejection of those opinions.

**B.  Whether ALJ's RFC findings were supported by substantial evidence.**

Claimant argues that substantial evidence does not support the ALJ's physical RFC findings because the ALJ, in expressly relying upon the opinion of reviewing DDS physician Dr. Mitchell, failed to include limitations imposed in the opinion. (R. 121). The ALJ, in purporting to rely upon Dr. Mitchell's opinion, failed to include certain limitations in the opinion and made findings not based from the opinion. In his physical RFC determination that Claimant could

11

"climb," the ALJ failed to note Dr. Mitchell's postural limitation that, although Claimant could frequently climb a ramp or stairs, he could never climb a ladder, rope, or scaffolds. (R. 121). The ALJ also made a finding about the gross and fine manipulation abilities of Claimant's dominant and non-dominant hands, purportedly based upon Dr. Mitchell's report. (R. 37). Dr. Mitchell's report, however, makes no such assertions. (R. 118-25, Exh. 9E). Accordingly, the ALJ's physical RFC is inconsistent with the medical evidence upon which he purportedly based the RFC determination.

Further, the ALJ's conclusion regarding Claimant's ability to perform PRW is based upon a misrepresentation of the VE's testimony. When the medical evidence is inconclusive as to the claimant's RFC, vocational expert testimony is needed to further develop the record. *Lamb v. Bowen*, 847 F.2d 698, 704 (11th Cir. 1988). For a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. *Vega v. Massanari*, 265 F.3d 1214, 1220 (11th Cir. 2001); *see also Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). Because the opinions of physicians in the record were inconsistent, the ALJ based his ultimate finding in this case on the VE's testimony. The ALJ stated that VE "Hare . . . testified that a person with Claimant's RFC could perform Claimant's past relevant work ("PRW")." (R.40). Based purportedly upon the VE's testimony, the ALJ found that Claimant could perform his PRW, and therefore was not disabled. (*Id.*).

The VE, however, did not testify that Claimant could perform his PRW. Based on incomplete details from Dr. Mitchell's opinion and "from looking at [Claimant]" himself, the ALJ formed his first hypothetical regarding physical capacity and asked the VE whether Claimant could perform his PRW, assuming that he could perform sedentary work with limitations "in his ability to use his left arm to perform fine manipulation and gross

12

manipulation, . . . interpret[ed] as his limited ability to do pushing and pulling with his left arm." (R. 233).  The ALJ then answered his own hypothetical before the VE could respond: "I know [Claimant] can't [do PRW under this hypothetical] because [PRW] was all medium." (*Id.*).  The ALJ posed no further hypothetical to the VE regarding Claimant's ability to perform work at a *medium* level of physical exertion, which was the level of Claimant's PRW, but simply made a finding that Claimant was physically able to perform his PRW. (R. 234).  Yet, "an ALJ may not arrogate the power to act as both judge and physician." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1991); see *also Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987) (holding that the ALJ failed to apply the correct legal standard when he based his credibility determination upon the claimant's appearance at the hearing and the absence of sufficient medical evidence).  The VE did not testify that Claimant could perform his PRW and responded to no meaningful hypotheticals from which the ALJ's ultimate conclusion could be reached. Because the ALJ's finding was not based on the VE's testimony or an examining physician's medical opinions, the court is at a loss to find that substantial evidence supports it.

The ALJ failed to pose to the VE proper hypotheticals which comprised all of Claimant's impairments, improperly made judgments based upon Claimant's appearance, and supplanted his own answers to hypotheticals  for those of the VE.  Consequently, the opinion is not based upon substantial evidence.

## VI. Conclusion

For the above reasons, the court finds that the ALJ's decision is not supported by substantial evidence. Consequently, the court will REVERSE the Commissioner's decision and REMAND for further proceedings consistent with this opinion.  The court will enter a separate order consistent with this memorandum opinion.

DATED this 24th day of June, 2008.

                                           _____
                                           KARON OWEN BOWDRE
                                           UNITED STATES DISTRICT JUDGE